DOEBLER (UNITED STATES v.). See Case No. 14,977.

---

## Case No. 3,960.

### DOGGETT v. EMERSON et al.

[3 Story, 700.][1]

Circuit Court, D. Maine. May Term, 1845.

EQUITY—RESCISSION OF SALE — FRAUD AND MISTAKE—LACHES—PRESUMPTION OF AGENCY—RATIFICATION.

1. Where a purchaser buys on faith of a false representation by the seller, touching the essence of the contract, the sale will be set aside in equity, whether the misrepresentation were the result of fraud or of mistake.

[Cited in Smith v. Countryman, 30 N. Y. 670.]

2. A seller is bound to act with the utmost good faith, and if he mislead the purchaser by a false or mistaken statement as to any one essential circumstance, the sale is voidable.

[Cited in Barnes v. Union Pac. Ry. Co., 4 C C. A. 199, 54 Fed. 90.]

3. Where a sale of certain timber lands was made in 1835, and the present bill was brought in 1841 to set it aside, for mistake and fraud, and it appeared, that false statements had been made by the seller, going to the essence of the bargain, on which the buyer had relied, and that knowledge of the fraud had not before come to the knowledge of the plaintiff,—it was held, that the lapse of time was not, under the circumstances, a bar to the suit.

[Cited in Webb v. Powers, Case No. 17,323; Veazie v. Williams, 8 How. (49 U. S.) 158; Marsh v. Whitmore, Case No. 9,122.]

4. Where a paper was executed by A, as agent of the defendant, to D, giving D the refusal of certain timber lands, for a certain time, at a certain price, and D subsequently sold the land to the plaintiff, and the deed of conveyance to the plaintiff was made by A directly, and not through D, and the plaintiff brought an action against A, and his principals, to set aside the sale on account of fraudulent misrepresenta-

tions by D,—it was held, that the circumstances created a legal presumption, that D was acting as agent of A and his principals, and that, as A, by his conduct, subsequently ratified the sale, he and his principals were responsible for all D's misrepresentations made at the sale, whether D exceeded his authority or not, inasmuch as they could not ratify a portion of the transaction and reject the rest.

[Cited in Foster v. Swasey, Case No. 4,984; Mason v. Crosby, Id. 9,234; Smith v. Babcock, Id. 13,009.]

5. Where a sale made by an agent is ratified by his principals, the agent's representations, made at the time of the sale, bind his principals.

[Cited in Hough v. Richardson, Case No. 6,722; Mason v. Crosby, Id. 9,234; Veazie v. Williams, 8 How. (49 U. S.) 157.]

[This was a bill in equity by John Doggett against William Emerson and others.]

The bill, in substance, stated as follows: "That on or about the twenty-first day of February, in the year 1835, William Emerson, Amos M. Roberts, Isaac Farrar, Joseph W. Mason, and Nicholas G. Norcross, all of Bangor, in the state of Maine, merchants, defendants hereinafter named, purchased of the state of Maine, a township of land, numbered three in the thirteenth range of townships west from the east line of the state, containing, exclusive of land covered by water and the public lots reserved by the state, nineteen thousand eight hundred and twenty-five acres; that the said purchasers agreed to pay therefor, to the said state, sixty-four thousand four hundred and thirty-one dollars and twenty-four cents, it being three dollars and twenty-five cents per acre; one third part of which they paid in money at the time of the purchase, and for the remainder they gave their joint notes, which remain unpaid up to the time of filing this bill of complaint; that the said purchasers did not take a deed of conveyance of the said land, but made an agreement with the land agent of the said state, through whom the said purchase was made, whereby the said agent bound himself to convey the said land to the said purchasers or their assigns, when requested so to do. That the said Roberts, Farrar, Norcross, and Mason, agreed with the said Emerson, at the time of the said purchase, or shortly thereafter, that he, the said Emerson, should act as the agent of the company in selling the said land, and parts and portions thereof, which the said Emerson agreed to do. That a short time after the said purchase, as the plaintiff believes, some time in the month of May, in the year 1835, but the exact time the plaintiff does not know, the said Emerson, as well for himself as on account of his said associates, gave to one John Williams, then of the state of New Hampshire, but now of the state of New York, a certain bond, or obligation or power of attorney, wherein and whereby the said Emerson bound himself and his associates to procure a conveyance of the said land to be made to the said Williams or his assigns, on being paid therefor the sum of six dollars and fifty cents per acre; the sole object of

which said obligation was to enable the said Williams to make sale of the said land on account of the said Emerson and his said associates: that the said Emerson, as agent, as aforesaid. both before and at the time of executing the said instrument, stated to the said Williams, that the said township contained twenty-two thousand and forty acres, besides the public lots reserved by the state, and gave the said Williams distinctly to understand, that he, the said Emerson, and his said associates actually paid the said state for twenty-two thousand and forty acres. whereas, in truth and in fact, the said state, in selling to the said Emerson and his said associates, deducted from the whole quantity of land in the said town, two thousand two hundred and fifteen acres, so much thereof being covered with water. and having no timber thereon; and the said Emerson and his said associates paid the said state in money and notes as aforesaid, for nineteen thousand eight hundred and twenty-five acres only as aforesaid. And the said Emerson as agent. as aforesaid. at the time of executing the said obligation to the said Williams, delivered to the said Williams, for the purpose of enabling him to sell the said land, certain certificates or statements made by persons who had explored and examined the said township, with the view of ascertaining the quantity of timber thereon, which certificates represented and set forth that the said township was one of the best timbered tracts in the state of Maine, and that the quantity of good, sound merchantable pine timber thereon would average eight thousand feet to the acre. throughout the township; making the whole quantity of sound merchantable pine timber on the said township one hundred and seventy-six millions three hundred and twenty thousand feet. And the plaintiff further showeth, that on or about the eighth day of June, in the year 1835. the said John Williams, as the agent of the said Emerson. Roberts, Farrar, Norcross and Mason, as aforesaid, applied to the plaintiff, and proposed to sell to him a portion of the said township. and represented and stated to the plaintiff, that the said township contained twenty-two thousand and forty acres; that it was the best timbered township in the state of Maine, and that it contained eight thousand feet of good, sound merchantable pine timber to the acre; the whole quantity of good timber, as aforesaid. on the township, exceeding one hundred and seventy-five millions feet. And in confirmation of his said statements, the said Williams exhibited to the plaintiff the said certificates, received of the said Emerson as aforesaid, and certain other certificates of a like character, all of which represented and affirmed that the said township would not produce less than eight thousand feet of good pine timber to the acre as aforesaid. And the said Williams. on the said eighth day of June, when treating with the plaintiff as aforesaid, stated that he had on that day made sale of four-tenths of the said township to some gentlemen in Portsmouth, at the rate of six dollars and fifty cents per acre; that the said obligation from the said Emerson would expire by limitation on that day; and if the plaintiff desired to purchase any part of the said land, the bargain must be immediately completed; that the said land could be had for six dollars and fifty cents per acre, and no less; and that the whole purchase-money would be paid to the said Emerson. And the plaintiff further says, that this treaty with the said Williams was had at Stillwater, near Bangor. in the state of Maine, at a great distance from the said township, and under circumstances rendering it impracticable for the plaintiff to go upon and explore the said land,—all of which was known to the said Williams.

"And the plaintiff further showeth, that confiding in the statements of the said Williams, and in the evidence he exhibited, in regard to the quantity and quality of the timber on the said land, and in regard to the quantity of land in the said township, owned by the said Emerson and others, and believing the statements to be true, the plaintiff concluded to purchase one-eighth part of the said township, at the price named by the said Williams, and accordingly the said Williams, on the said eighth day of June, informed the said Emerson, Roberts, Farrar, Norcross, and Mason, of his said treaty and negotiation with the plaintiff. and that the plaintiff had concluded to purchase and give his notes for one-eighth of the said township, at six dollars and fifty cents per acre, estimating the township at twenty-two thousand and forty acres, exclusive of the reserved lots. And the said Emerson. Roberts, Farrar, Norcross, and Mason, on the said eighth day of June, upon being so informed, approved of the acts and doings of the said Williams in the premises, and on the same day obtained from the land agent of the state of Maine, at his office in Bangor, a deed of conveyance to the plaintiff. of the said eighth part of the said township, in common and undivided. and delivered the same to the said Williams. to be delivered to the plaintiff, and the said Williams did. on the same day, deliver the said deed to the plaintiff, whereupon the plaintiff, on receiving the said deed, executed and delivered to the said Williams, his several notes and drafts, to the amount of seventeen thousand nine hundred and seventy dollars and sixteen cents, all payable to the said Emerson, and all on interest. And the plaintiff further showeth, that the said Emerson, Roberts, Farrar, Norcross, and Mason, contriving how to wrong and injure the plaintiff in the premises, fraudulently concealed from the plaintiff the actual quantity of land purchased by the said Emerson and others of the said state; and fraudulently concealing from the plaintiff. that the said state, in selling to the said Emerson and his associates, had deducted from the whole

quantity of land in the said township, two thousand two hundred and fifteen acres, on account of a portion of the said township being covered with water and having no timber thereon, and representing that they purchased twenty-two thousand and forty acres, received from the plaintiff, as aforesaid, on the said eighth day of June, his notes for one eighth part of twenty-two thousand and forty acres, at six dollars and fifty cents per acre. And the plaintiff further says, that all the notes and drafts so given by him to the said Emerson, have been paid by the plaintiff, in full, both principal and interest. And he further showeth, that he became the purchaser of the said land, solely for the timber represented to be thereon, and that the said land, without timber, is worth to the plaintiff little or nothing; all of which was well known to the said Williams and Emerson, Farrar, Roberts, Norcross and Mason. And the plaintiff further states, that some time after the said purchase by him, as aforesaid, and after paying his drafts and notes, given to the said Emerson as aforesaid, to wit, in the month of July, in the year 1841, the plaintiff discovered, for the first time, that the said tract of land did not contain the quantity of merchantable timber represented by the said Williams to be thereon, nor the quantity of good merchantable timber represented by the said explorers, as aforesaid, but that on the contrary, on a thorough examination of the said township since made, it has been ascertained that there is but little or no sound merchantable timber on the said tract, and the said land is almost worthless, and the said parties acted in the sale and purchase of the said eighth part of the said township, under a mutual mistake in regard to the quantity and quality of timber on the said land; or else, that the said Williams, Emerson, Roberts, Farrar, Norcross, and Mason, fraudulently deceived the plaintiff in the premises, and wilfully misrepresented to him the quality and quantity of the timber thereon. And the plaintiff further showed, that the said Williams, Emerson, Farrar, Roberts, Norcross, and Mason, fraudulently deceived the plaintiff in regard to the quantity of the land in the said township, bargained for by the said Emerson, and others, as aforesaid, inasmuch as by their fraudulent acts as aforesaid, they induced the plaintiff to purchase and pay for more timber land than the said township actually contained, or than was purchased by the said Emerson and his said associates, which fraud was first discovered by the plaintiff in the month of July, 1841.

"And the plaintiff, in view of all the facts hereinbefore set forth, being advised that the said purchase of the said eighth of the said township made by him ought not to remain, but that the same should be rescinded, has often requested the said Emerson, Roberts, Farrar, Norcross, and Mason to rescind the same, and pay back to the plaintiff all the money so as aforesaid paid by him, and to restore the plaintiff entirely, and be restored, to the original position of the respective parties; and in particular that they would refund to the plaintiff the amount paid by the plaintiff for that portion of his said eighth part of the said land which is covered by water, and which the said Emerson and his said associates fraudulently obtained pay for as aforesaid. And the plaintiff well hoped that the said Emerson, Roberts, Farrar, Norcross, and Mason would have complied with such the plaintiff's reasonable request as in justice and equity they ought to have done: but now so it is, they refuse so to do, and, in concert with each other, they pretend, that there was no mistake between the parties in the bargain and purchase hereinbefore set forth, in regard to the quantity or quality of timber on the said land, and that no fraud was practised on the plaintiff either in regard to the quantity or quality of the timber on the said land, or in regard to the quantity of the said land, the contrary of which the plaintiff expressly charges to be true, and as evidence of the facts hereinbefore set forth he further states, that, on the 31st day of March, in the year 1841, the legislature of the state of Maine passed certain resolutions appointing certain persons therein named commissioners for the purpose of examining the equitable claims of any person or persons praying to be relieved from the payment of any moneys due to the said state for the purchase of lands sold after the first day of January, in the year 1834, and empowering such commissioners on a full examination of such cases to make a written report to the land agent, directing him to adjust and settle such claims in such way and manner and upon such terms, as to them should seem just and equitable; the resolutions requiring each applicant to make out and file with the land agent a statement of his case. The particulars of which resolutions will more fully appear by reference thereto. That on the 29th day of April, 1841, the said Emerson under the said resolutions filed in the land office of the state of Maine his petition, as follows:

" 'To the Honorable Board of Commissioners, Appointed by the Resolves of March 31st, 1841, to Settle Claims between Certain Individuals and the State: The memorial of William Emerson, of Bangor, in the county of Penobscot, Esquire, respectfully showeth: That on the twenty-first day of February, A. D. 1835, your memorialist, together with Amos M. Roberts, Isaac Farrar, Joseph W. Mason, and Nicholas G. Norcross, by the style and name of Norcross and Mason, all of said Bangor, merchants, purchased of the state, township No. 3, range 13, of townships west from the east line of the state, containing nineteen thousand eight hundred and twenty-five acres, at three dollars and twenty-five cents per acre. That they paid in

cash at the time of the purchase twenty-one thousand four hundred and seventy-seven dollars and eight cents, and gave their notes for the balance, being two-thirds the amount of the purchase, on which the sum of four thousand two hundred and thirty-nine dollars and thirty-nine cents has since been paid, making a sum total of twenty-five thousand seven hundred and sixteen dollars and forty-seven cents received by the state on account of said town. The purchase was made without the purchasers having seen said town and without any other knowledge of its quality than the representations of the state's agent, who assured the purchasers that by the report of Joseph L. Kelsey, made by the direction of Hon. Daniel Rose, land agent, in 1831, the town contained eighteen million feet of merchantable pine timber of the first quality, that he had no doubt the estimates would rather overrun than fall short, as the state's surveyors were expected to be very cautious in their estimates. Relying on these statements and at the same time informing the agent that they had no knowledge of the town other than his representations, they made the purchase. There has been no timber cut and the town remains in the same condition as when purchased. The state has sold the best timber lands in this section the last two years at prices varying from one dollar to one dollar and twenty-five cents per acre; and picked lots in No. 4, in the 13th range, a town lying directly north of No. 3, and said selected lots being greatly superior to No. 3, were sold by the agent in 1839, at one dollar and twenty-five cents per acre, Upon examining the town for the purpose of operating, they found the timber so defective as to be nearly worthless. Large groves of pine which had a fair appearance, and would be likely to deceive a person not well acquainted with lumbering, were found upon inspection to be so rotten as to be unfit to cut, and after a thorough examination they could not find a chance to put in more than one team for a winter's logging upon merchantable timber. Instead of eighteen million the town does not contain three million, probably not one million of merchantable lumber of the first quality. Your memorialist would further represent, that the town was purchased exclusively for timber, and that the soil at such a distance from settlements and roads is comparatively worthless. This town was estimated by Milford P. Norton, Esq., land agent, in 1830, to be worth twenty-five cents per acre. This communication was made to the governor and council and filed away in the vaults attached to the secretary's office, and its existence was unknown at the land office until the present year. This price probably bears as large a ratio to the actual amount of timber of the first quality as three dollars and twenty-five cents does to the amount certified to by Mr. Kelsey, then in the employ of the state,

and your memorialist would be equitably entitled upon this principle to have a large portion of the payment already made to the state refunded. But he has no expectation, nor does he ask the state to pay back any part of the money already received. The state, however, still holds the notes of your memorialist to a large amount, given for said town in exchange for the orignal notes, and secured by mortgage; he having assumed the whole debt to the state, and said Roberts, Farrar, and Norcross and Mason having released to him all claims against the state for deduction or otherwise, in consideration of said transaction. Your memorialist, therefore, as the representative of the original purchasers, believing himself entitled upon every principle of equity, justice, and expediency, to have the notes, held by the state against him for said town, cancelled, and his mortgages to the state on account of the said notes discharged, makes this request of your honorable body, and files this brief statement of his case, agreeably to the provisions of the "Resolves for the appointment of a board of commissioners to settle claims between certain individuals and the state," approved March thirty-first, 1841, and a resolve additional to said resolve. William Emerson.'

"And the said commissioners afterwards, on the twentieth day of July, 1841, made their report touching the said matters, as follows: 'To Elijah L. Hamilton, Esq., Land Agent of the State of Maine: The undersigned commissioners appointed by certain resolves of the legislature of the state of Maine, approved the thirty-first day of March, A. D. 1841, and the sixteenth day of April, 1841, "to settle the claims between certain individuals and the state," having given notice, as in and by said resolves is required, and in pursuance thereof having assembled at the court house in the city of Bangor, on the twelfth day of July, A. D. 1841, and continued in session by adjournment, from day to day, to the time of signing these presents: On the memorial of William Emerson, duly filed in the land office of said state, after having heard the evidence on the part of the memorialist, and the arguments of his counsel, and of the attorney general thereon; we find that the said Emerson, together with Amos M. Roberts, Isaac Farrar, and Messrs. Norcross and Mason, on the twenty-first of February, 1835, contracted with the then land agent of the state, for the purchase of township No. 3, in range 13, agreeing to pay therefor sixty-four thousand four hundred thirty-one dollars and twenty-four cents, one third of which, viz., twenty-one thousand four hundred seventy-seven dollars and eight cents, was at that time paid by the contractors in equal quarters, and the residue secured by their joint notes. That Norcross and Mason were to be interested in one quarter, and the others in a quarter each. No deed was at that time taken, and Emerson was employed by his associates, to

make sale of their rights, to wit, of their three quarters, which he effected through the instrumentality of John Williams, at the rate of about thirty thousand dollars for each quarter. And thereupon procured conveyances to be made by the then land agent for the state, viz., to John Doggett, of five fortieth parts, to Cyrus Goss, of four fortieth parts, to John Williams, of five fortieth parts, and to Bartlet and others of sixteen fortieth parts, making three fourths of the said township, the said Emerson retaining his right to the said other quarter part, which was not conveyed to him till some time in 1837. Farrar and Roberts received of Emerson their shares of what was realized for the three fourths of the township, sold as aforesaid. But the said Norcross and Mason received the amount due for their share in the said Emerson's securities, and then or subsequently, paid the said Emerson the amount of the money due to the state from them for their part of the land which Emerson thereupon assumed to pay. We find that subsequently and before the negotiation hereafter stated, the said Emerson had received of the said Roberts, the full amount of his proportion of the notes due to the state, viz., eleven thousand two hundred thirty-eight dollars and twenty-nine cents, with such interest as was due thereon at the time of receiving the same, and also of said Farrar what was due to the state from him towards his share of the said notes, viz., seven thousand one hundred dollars, he having paid to the state towards the same, all but that sum. We find that in 1837, Emerson, then being under obligation to pay the whole amount due on the said notes, gave his individual security therefor, securing the same by mortgage, and received in exchange therefor, the joint notes of the original contractors. We further find that the said township, at the time of the said contract and sale, did not contain pine timber of a sound and valuable quality to the amount of more than one fourth part of what was estimated in the survey and field notes of the surveyor, Kelsey, so that the township was much less valuable than either the land agent who sold the same, or the contractors for the purchase had reason to suppose, and that therefore the bargain was made under mutual mistake between the parties, inasmuch that we feel satisfied more money has been paid to the state, than the land was reasonably worth. And we believe it to be just, equitable and expedient, that the grantees and their assigns should have the full benefit of all that now remains due from the said Emerson to the state therefor. We further find that the said Emerson has never parted with his quarter part of the said township otherwise than by mortgaging it to the state as part of the collateral security for the payment of his said notes, and that the said Emerson is the legal assignee of one other eighth part of the said township, except that it is mortgaged

to the state, as further collateral security for the payment of his said notes. We further find that the said Isaac Farrar is, at this time, the legal owner of eleven fortieth parts of the said township, whereby he would become entitled to eleven fortieth parts of the benefits of whatever may be deducted from the amount due from the said Emerson to the state, but he having assigned all his claim to the benefit of any such deduction to the said Emerson, we consider the said Emerson to be the equitable assignee thereof, whereupon we deem it just, equitable and expedient, that a deduction from the amount due from the said Emerson on his said notes, should be made equal in amount to twenty-six fortieth parts of forty-two thousand nine hundred and fifty-three dollars and sixteen cents, being the amount for which notes were originally given by the contractors, as aforesaid, with interest thereon from the time when the same notes were originally given. And we accordingly order and decree that the deduction be made accordingly, and that on payment of the residue of the said Emerson's notes, the same be delivered up to him to be cancelled. Done at Bangor, this twentieth day of July, 1841. (Signed) Ezekiel Whitman. Frederick H. Allen. Anson G. Chandler.' And the said amount of twenty-six fortieth parts of forty-two thousand nine hundred and fifty-three dollars and sixteen cents, has since been indorsed on the notes of the said Emerson, by the land agent. in compliance with the said report."

The prayer of the bill was that, "upon a full and fair disclosure of the several matters aforesaid, the said purchase may be declared to be null,—the said Emerson, Roberts, Farrar, and Norcross and Mason compelled to refund to your plaintiff all moneys by them or either of them received as aforesaid,—and that the parties may be restored to their respective positions before the said contract was entered into; your plaintiff hereby offering to perform all acts necessary for him to perform in the premises; and that your plaintiff may have such further relief or such other relief in the premises as the nature of his case may require, and as may be agreeable to equity and good conscience."

The answer of Emerson stated that, on or about the 21st day of February, A. D. 1835, he "purchased in common and undivided with the said Roberts, Farrar, Norcross and Mason, of the state of Maine, township numbered three, in the thirteenth range of townships west from the east line of the state, which township contained according to the said purchase, exclusive of land covered by water and the public lots, nineteen thousand eight hundred and twenty-five acres—that these defendants paid therefor the sum of sixty-four thousand four hundred and thirty-one dollars, twenty-four cents, being three dollars and twenty-five cents per acre, exclusive of land covered by water and public lots—one third part of which they paid in

money at the time of the purchase, and for the remainder they gave their joint notes, which in December, A. D. 1837, were paid by this defendant by substitution of his own notes, secured by mortgage for the same amount. And that these defendants received from the land agent of the said state, an agreement to convey the said township, which said agreement is annexed to the answer of Isaac Farrar, one of these defendants, and makes a part thereof—the land covered by water and public lots aforesaid were deducted from the contents of the said township in our purchase of the state. And this defendant further answering, says, that he was by a certain writing, the original copy of which is annexed, constituted an agent of these defendants according to the terms thereof; and that afterwards and prior to the sale of the premises, as hereinafter set forth, the said writing was so modified (verbally, as this defendant thinks, for upon examination he is unable to find any written qualification of the said authority) as to authorize the said Emerson to dispose of these defendants' interests in the said township, for a sum not less than one hundred and twenty thousand dollars, one third in cash at the time of sale, and the residue thereof in one and two years thereafter; and this defendant says, that the said written agreement, qualified as aforesaid, was the authority under which and by which he effected a sale as is hereinafter stated. And this defendant further answering, says, that after the said written agreement, and prior to the said modification thereof, having had an offer of twenty-five hundred dollars from one Goddard for a refusal of the said township for a given number of days, at a given price, he consulted with these defendants, who specially authorized him (or a majority of them so did,) to give such refusal upon the terms and conditions proposed by the said Goddard; and this defendant says, that he was thereunto induced by the consideration of the amount paid for the said refusal, and the expectation entertained by him, that the said Goddard, or the said Goddard and his friends would purchase the said township. And this defendant further answering, says, that in the month of May, A. D. 1835, he gave to John Williams, then of the state of New Hampshire, now of the state of New York, an obligation under his own signature, to convey to the said Williams three fourths of the said township, on payment by the said Williams of the sum of six dollars and fifty cents per acre; the said obligation was in writing, and, as this defendant thinks, was written by Cyrus Goss, of Bangor. It was presented to him by the said Goss on the morning of the day on which it was executed, previous to the departure of the steamboat which left Bangor on the same morning, in which boat the said Williams then left; that he signed the said obligation at the request of the said Goss, who had previously written the same; that

he had had no previous conversation with the said Goss or the said Williams, in respect to giving either to the said Goss or the said Williams a refusal of the said township, and that in the conversation with the said Williams on the morning aforesaid, there was not consumed the space of ten minutes; that the said Williams was in haste to leave in the steamboat, and that, although this defendant objected at the time to the phraseology, and to the terms of the said refusal, yet there not being time to re-write the same, the said refusal was signed by this defendant and delivered to the said Williams. And this defendant says, that although the said agreement in terms was a stipulation for the conveyance of the said township to the said Williams, at the rate of six dollars and fifty cents per acre, this defendant says that the said refusal was in fact upon the terms and conditions, that the said Williams should have the refusal of the said township for the period of twenty days, for the sum of ninety thousand dollars for three fourths thereof, which was the proportion of the said township embraced in the said written refusal. And this defendant believes that the said refusal stipulated for the payment of interest from its date.

"And this defendant further answering, says, that the true intent and understanding between this defendant and the said Williams, in the matter of the said refusal, however the same may have been written, was that the said Williams should have the refusal of three fourths of the said township for the period of twenty days, and that at any time within that period, upon the payment by the said Williams to the said Emerson of the sum of ninety thousand dollars, the said Williams should have a conveyance of three fourths of the said township, according to the stipulations of the said refusal. And this defendant further answering, says, that previous to this refusal given to the said Williams, a Mr. Weeks, who this defendant supposed to be a friend of Mr. Goddard, to whom a previous bond had been given as aforesaid, applied to this defendant to purchase a portion of the said township, and was at the time of the said refusal upon the said township, having the verbal agreement of this defendant that he should have a quarter part thereof, if upon examination he was desirous to have it, which was the reason why this defendant gave to the said Williams a refusal of three fourths of the said township only. The said defendant is unable to find the said refusal among his papers, and believes the same has been destroyed. And this defendant further answering, says, that he made his obligation for the conveyance of the said three fourths of the said township, with the said Williams as before stated; that the said Williams, as this defendant is informed and believes, sold one eighth of the said township to this complainant; that this complainant paid the

said Williams in notes and drafts to the amount stipulated between them for the said purchase. And this defendant says, that he received from the said Williams, in discharge of the said Williams's refusal, certain notes and drafts, including certain notes and drafts of this complainant, to the amount of ninety thousand dollars, with interest from the date of the said refusal. And this defendant denies that the said Williams was authorized to act, or did act or assume to act, as the agent of these defendants in his negotiation with this complainant. On the contrary, this defendant says that his contract of refusal was with the said Williams—that he received of the said Williams, and not of this complainant, this complainant's draft and notes aforesaid, as the property of the said Williams—that he was not present when the said draft and notes were executed or delivered to the said Williams, and that this complainant's notes, though payable to this defendant, were not delivered to the said Williams as the property of this defendant, but as the property of the said Williams, and were by the said Williams delivered to this defendant as the property of the said Williams, and in cancellation of his the said Williams's obligation to this defendant. And this defendant admits that he received from the said Williams two promissory notes, signed, as he believes, by John Doggett & Co., for the sum of five thousand nine hundred and sixty-nine dollars sixteen cents each, payable in one and two years, and a draft drawn by John Williams on John Doggett & Co., at sixty days, for the sum of six thousand thirty-one dollars eighty-four cents. And this defendant denies that the sole object of the said refusal was to enable the said Williams to make sale of the said township on account of these defendants. And this defendant, further answering, denies that as agent of these defendants, or personally, that he stated to the said Williams that the said township contained twenty-two thousand and forty acres, besides the public lots reserved by the state, although he believes the said township to contain that number of acres. And this defendant denies that he distinctly or indistinctly, directly or indirectly, gave the said Williams to understand, that these defendants paid the state for that number of acres, or any number exceeding the actual number paid for, or that there was not deducted two thousand two hundred and fifteen acres covered with water. And this defendant denies, that at the time of executing his said refusal to the said Williams, or at any time, he delivered to the said Williams any certificate or statement made by persons who had explored and examined the said township; on the contrary, this defendant says that he made no representations whatsoever respecting the number of acres which were embraced in the said township, or of the number of acres covered by water, or of the number of acres

embraced in their purchase of the state. And this defendant says, that he delivered neither to the said Williams, nor to the said Goss, nor to any person, any certificate containing any estimate of any quantity of timber on the said township, or any certificate that the same had been explored by any person, or make any representations to the said Williams respecting the said township.

"And this defendant further answering, says, that he has no knowledge of any representations made by the said Williams to this complainant, or that the said Williams exhibited to this complainant any certificates respecting the said township, neither does this defendant know the consideration which induced this complainant to enter into the contract of purchase with the said Williams, and this defendant expressly denies that he either knew or approved of any acts or doings of the said Williams in the premises. On the contrary, this defendant says, that his said contract or obligation was with the said Williams; that he did not know this complainant in the purchase, otherwise than by receiving of the said Williams this complainant's notes and drafts as aforesaid, as so much money due from the said Williams to these defendants, and this defendant's recollection and belief is, that he knew not of this complainant's said purchase, or that this complainant proposed to make the said purchase until the evening of the expiration of the said refusal. And that this defendant on the succeeding day notified the land agent of the said state, after he had received from the said Williams the consideration expressed in his said refusal, that the said agent might convey the said three fourths to whomsoever the said Williams should direct—that the other defendants were not present at the time of the said settlement with the said Williams, neither was this complainant—that he considered himself as negotiating with the said Williams, and had no occasion to inquire, neither did he inquire or know the relations which subsisted between the said Williams and this complainant. And this defendant further answering, denies that he or any of these defendants to his knowledge fraudulently or otherwise concealed from this complainant the quantity of land purchased by these defendants from the state, or that the said state in selling to these defendants had made any deduction from the quantity of land in consequence of the same being covered by water and having no timber thereon, or that he or they represented to this complainant any given quantity of acres. And this defendant denies that he, or either of these defendants, to his knowledge, knew for what object this complainant made his said purchase, and this defendant has no knowledge when this complainant first discovered anything respecting the value of the said township, and denies that he has ever made any such discoveries as this complainant in this part of his said bill has

alleged. And this defendant says that in April last he subscribed a memorial, a copy of which makes part of this complainant's bill, which said memorial was drafted by his attorney, and was intended to contain a true representation of the facts therein set forth, that all therein set forth is not true in respect to this defendant. This defendant was not present when the said purchase was made, and received no assurances or representations whatever from the said land agent, that the examination of the said township in the said memorial mentioned, had reference to the examination made by Benjamin P. Gilman and others associated with him in his examination, and the estimate made by Milford P. Norton, Esq., had reference to the said Norton's written communication to the governor and council, as is therein stated.

"And this defendant further answering, says, that at the time of his said purchase of the state, he had not seen the report of the said Kelsey, and although he was informed that the said Kelsey had made such a report as in the said complainant's bill is set forth, the time occupied by the said Kelsey in making his said exploration, the manner in which the said exploration was made, and the means which the said Kelsey possessed of forming an estimate of the quantity or quality of timber on the said township, were not known to him, which was all the knowledge this defendant possessed respecting the value of the said township. This defendant had been for several years previous to the said purchase engaged in the lumbering business; he knew the difficulty of obtaining an accurate estimate of the quantity of timber upon a township of land, and the still greater difficulty of ascertaining the quality of that timber. He did not believe that the said township had been explored by the said Kelsey in such a manner as would enable him to form an accurate estimate of the quantity or quality of the timber thereon, and he would not have purchased the said township for the purpose of operating upon the same, without a more thorough examination than he supposed the said Kelsey had bestowed, nor without knowing the particular means of judging which any explorer had possessed. And this defendant further says that he did not purchase the said township principally for the timber supposed to be thereon, nor for the purpose of retaining it, but for the purpose of disposing of the same in the market at that particular period of excitement, and in the then peculiar condition of the market; that at this distance of time he is unable to say what quantity of timber he then supposed was on the township, or that he supposed any definite quantity. His remembrance and belief is that he considered the quantity wholly unsettled; he could have entertained no opinion that there was any particular quantity, upon the information which he then possessed. He supposed that it might considerably exceed or fall short of

the said Kelsey's estimate, that he neither purchased nor sold upon the supposition of any particular quantity. He considered that wholly unsettled, and that it was a risk which he incurred in the first instance, and the complainant in the last; that whatever were the opinions entertained by this complainant and which induced his purchase, they were unknown to and not participated by this defendant. This defendant further answers and says, that land in the section of the state where this township is situated, is chiefly valuable for its timber. That this defendant received from the said Williams, in notes and drafts, the sum of ninety thousand dollars with interest from the date of the said refusal, and no more; that of this ninety thousand dollars no part or portion thereof belonged to this defendant. His interest in the purchase from the state was one fourth, which was not sold to the said Williams or to any other person. That he has no knowledge that this complainant has made any exploration of the said land; that one David Smiley was on the said township in the spring of 1836, examining the timber, and that Benjamin P. Gilman and his associates, in the fall of 1839, examined the said township for the purpose of locating teams thereon, and that John Turner, for Leonard Jones, was on the said township for a few days during the last summer, and that this defendant knows of no other exploration since the exploration of the said Kelsey, for the purpose of ascertaining the quantity of timber on the said township. And this defendant is unable to say what quantity of timber is on the said township, what is the quality of the timber, what is the present value of the land without the timber, or what is the value of the timber now on it. This defendant has no knowledge nor information respecting the quantity of timber or quality of the same, or the present value of the land without the timber, which would lead him to a belief respecting either, upon which a prudent man should act in making a purchase of the same for the purpose of operating, or which would justify this defendant in stating any particular quantity of good merchantable timber. This defendant means to say, that if he were asked how much timber, merchantable or otherwise, was now on the said township, he should be obliged to answer hypothetically, that if the representations of this man were to be relied on as accurate, there would be one quantity—that if the representations of another, there would be another quantity, and so on; that this defendant has no knowledge of any such exploration or examination of the said township as would satisfy him, or justify him in expressing an opinion which might or could properly be expressed or called by the term belief. This defendant has been informed that there are large bodies of timber on the said township, and the quality of it has been variously represented to him by various in-

dividuals. He has no knowledge or belief that any timber has been taken off since the sale to this complainant, and that if the said township contained three millions of good pine timber, its value would depend upon the situation of the said timber, and a variety of other circumstances. Stumpage in that section of the state commands four or five dollars per thousand. And this defendant further answering, says, that after the said first payment to the state, the said Farrar paid to the state a certain sum, the amount of which is not recollected by this defendant, which was endorsed on these defendants' notes. And this defendant is informed and believes, that the amount awarded by the said commissioners has been endorsed on the notes of this defendant, the precise amount of which in dollars and cents this defendant does not recollect; he believes it to have been twenty-six fortieths, according to the report of the said commissioners. And this defendant denies all and all manner of unlawful combination and confederacy, wherewith he is by the said bill charged, without this, that if there is any other matter, cause, or thing, in the said complainant's bill of complaint contained, material or necessary for this defendant to make answer unto, and not herein and hereby well and sufficiently answered, confessed, traversed and avoided or denied, is true, according to the knowledge or belief of this defendant. All of which matters and things this defendant is willing and ready to aver, maintain, and prove, as this honorable court shall direct, and humbly prays to be hence dismissed, with his reasonable costs and charges in this behalf most wrongfully sustained. William Emerson."

The paper refered to in this answer as constituting Emerson as agent of the other defendants, is as follows: "Whereas we, William Emerson, Isaac Farrar, Amos M. Roberts, and Norcross and Mason, all of Bangor, gentlemen, have this day purchased of John Hodge, land agent of the state of Maine, township number three in the thirteenth range, west from the east line of the state, and have, in addition to the cash payment, given our notes to Asa Reddington, Jr., treasurer of Maine, for forty-two thousand nine hundred and fifty-four dollars and seventeen cents, in three notes, for fourteen thousand three hundred and eighteen dollars and six cents, each, payable in one, two, and three years from date, and interest annually, the said township being purchased in equal shares, and our several liabilities on the said notes being equal. Now, therefore, we agree and determine to put the said township into the hands of William Emerson, and authorize him to take a deed of the same on the following terms, and for the following purposes, to wit: To sell, for the sum of one hundred thousand dollars, for the benefit of the parties above named, and to pay out of the proceeds of the said town the

three notes above described, as of this date, and to pay over the balance, in equal proportions, on demand, to the said Emerson, Roberts, Farrar, and Norcross and Mason. And the said Emerson hereby agrees, in consideration of the premises, to take the charge of the said town, to sell it, if opportunity should present, for the purposes aforesaid, and, if sold, to pay the notes as aforesaid, and to pay over the balance in manner above described, to the parties above mentioned. And it is mutually agreed that a majority of the above named parties shall control the direction of the said township, and make other regulations as they may at any time deem proper, whether in price or terms of payment, the present being considered cash in hand. Provided, however, that nothing herein contained shall restrict the said Emerson from selling the said town at a higher sum than one hundred thousand dollars. In witness whereof, we have hereunto subscribed our names, this twenty-first day of February, 1835."

The answers of the other defendants contained nothing substantially different.

The cause was argued partly at the May term in 1844; and upon the suggestion of the court, a supplemental bill was filed, to which there were answers put in.

The supplemental bill, after recapitulating the facts stated in the original bill, proceeded as follows: "And now the said Doggett further showeth, that the original paper, obligation, or refusal, given by the said Emerson to the said Williams, for the conveyance of three fourths of the said township of land, referred to in the original bill, at six dollars and fifty cents per acre, was by the said Williams exhibited to this complainant, at the time of, and pending the negotiation between the said Williams and this complainant for the purchase of a part of the said township. And the said Williams, at the time when the said paper was so exhibited to this complainant, in order to induce this complainant to become a purchaser of a part of the said township, expressly stated to this complainant that he, the said Williams, was desirous of purchasing, and intended to purchase, a part of the said township, under and according to the terms of the said obligation, designedly giving this complainant to understand that the said township of land was a full township, containing, exclusive of reservations, twenty-two thousand and forty acres, and that the sum of six dollars and fifty cents per acre was the true price for which the said township could be obtained. And that the same could not be purchased of the said Emerson for a less price than six dollars and fifty cents per acre. And that he, the said Williams, was desirous of purchasing, and would purchase, a part of the said township at that price, and that the whole sum of six dollars and fifty cents per acre was to be paid to the owners of the said township. And this complainant avers

that the whole negotiation. between the said Williams and this complainant, was predicated, and proceeded. upon no other idea than that the said obligation contained the truth as to the price per acre for which the said township could be purchased of the owners, and concealed no fact material. in the said negotiation, to the purchaser. And your complainant further avers that, after examining the said obligation. he had reason to believe, and did believe, that the owners of the said township of land would not sell any part thereof for a less sum than six dollars and fifty cents per acre, and that the entire sum of six dollars and fifty cents per acre for three-fourths of twenty-two thousand and forty acres was to be paid to the owners thereof. And he further believed that the said Williams would also purchase a portion of the said land at six dollars and fifty cents per acre. And, inasmuch as this complainant supposed and believed that the said Emerson was well acquainted with the value of timber lands in Maine, this complainant was induced by the terms of the said obligation to believe, and did believe, that the said land was well worth the aforesaid sum of six dollars and fifty cents per acre. And your complainant further avers. that in making the purchase of one eighth of the said township as stated in the original bill, he not only confided in the certificates referred to in the said bill. and the representations of the said Williams and the said Emerson in relation thereto, but he also fully relied upon the said written obligation of the said Emerson, and the statements of the said Williams in relation thereto, and the natural inferences to be deduced therefrom. And your complainant further in fact avers that the sum of six dollars and fifty cents per acre was not the price for which the said Emerson agreed to sell the said three fourths of the said township. but. on the contrary, the agreement between the said Emerson and the said Williams was, at the time the said written obligation was given. that the same three fourths of the said township would be sold for the sum of $90,000, which is a much less sum than six dollars and fifty cents per acre. and all which was well known to the said Emerson at the time he gave the said written obligation to the said Williams. And your complainant expressly charges that, by means of the said false and fraudulent written refusal thus given by the said Emerson to the said Williams. the said Emerson, agent of the owners as in the original bill is set forth, did. through the instrumentality of the said Williams, commit a gross fraud upon the complainant, or knowingly enable the said Williams so to do, as the facts stated herein, and in the original bill, fully show. And this complainant further avers, that at the time when the said Emerson gave said written obligation to the said Williams, the same being of a false and fraudulent character, and well known by the said Emerson so to be, he the said Emerson also well knew. or had good reason to believe, or mistrust that the object of the said Williams in obtaining the same, thus setting forth a price per acre for the said land greater than the said Emerson had in fact agreed to sell the same for. was, and could be, none other, than that, by means thereof, the said Williams might be enabled to dispose of the said land to others, at a price exceeding that for which the said Emerson had so agreed to sell the same, by concealing the true price, and inducing such other persons to believe, that the said Emerson would not sell the said three fourths of the said township for a less sum than six dollars and fifty cents per acre. And so the complainant charges that the said Emerson thus knowingly and wilfully placed it in the power of the said Williams to deceive and defraud other persons who might be disposed to purchase the said land, or a portion thereof, in the said purchase. and did deceive and defraud this complainant through the instrumentality of the said Williams, as is herein, and in the said original bill, fully set forth. And this complainant further avers, that in pursuance of the design of the said Williams in obtaining the said written obligation. he did affect to become a purchaser of a portion of the said township, to wit, of one eighth part thereof. And the said Williams and this complainant, and other persons who purchased other portions of the said township at the same time, received deeds of the several portions of the said township, so purchased by them. And this complainant and the said other persons placed their notes given in payment, made payable to the said Emerson, or his order, in the hands of the said Williams, who delivered the same to the said Emerson, together with his own notes for a small sum, being the difference between the sum of $90,000. and the amount of notes and drafts given by the said other purchasers and this complainant, this complainant being ignorant of the exact amount of the notes so given by the said Williams. and supposing at the time. that the said Williams paid the full sum of six dollars and fifty cents per acre, for one eighth of the said township. And the whole amount of notes, so given, were, by the said Emerson. divided and apportioned with the other defendants, though in what precise manner this complainant is unable to set forth. To the end. therefore, that the said defendants may answer the matters and things hereinbefore set forth by way of supplement, and that your complainant may have such and the same relief against the said defendants as is prayed for by the original bill. this complainant prays that the said defendants may be held to answer the premises. and that such other and further proceedings may be had as the nature of this case may require, and to equity may appertain."

The answer of Emerson stated, that

"whether this defendant's obligation to the said Williams for the conveyance of three fourths of said township, at six dollars and fifty cents per acre, was by the said Williams exhibited to this complainant, at the time of and pending the negotiation between the said Williams and this complainant, for a purchase of a part of the said township, this defendant has no knowledge or means of belief. And this defendant further answering, says, that he has no knowledge in respect to the said paper having been exhibited to this complainant, or to any inducements the said Williams had to exhibit the said paper, if any such paper was exhibited; or what declarations were made by the said Williams to this complainant. The said Williams did purchase a part of the said township, but not according to the terms of the said obligations. And this defendant further answering, says, that if the said Williams did give this complainant to understand that the said township of land was a full township, containing, exclusive of reservations, twenty-two thousand and forty acres, the said representation was true in point of fact; that the said township was a township six miles square, which contains that number of acres, and although the state sold to these defendants the said township, deducting the number of acres covered by water, these defendants, nor the said Williams would have been guilty of a fraud in reselling the same as and for a full township, without deduction, had they sold it. And this defendant further answering, says, that it is the usual custom in that section of the country to sell townships without reservation; and that the reason why this was not sold by the state, was because the state had surveyed it into sections, with a view to sell it in fractional parts, by sections as surveyed; and that there was no fraud or misrepresentation, and could have been none, in the sale of this tract as a township, in representing it as being a full township, and as containing twenty-two thousand and forty acres. And this defendant further answering, says that he has no knowledge, or means of knowledge or belief, what representations said Williams made to this complainant, as to what price, per acre, said township could be obtained for, or what said Williams said in respect to purchasing the same, or what he said in respect to the sum which was to be paid to these defendants. And this defendant further answering, says, that he has no knowledge what induced this complainant to make the said purchase, nor what paper, certificate, or obligation, if any, was exhibited to this complainant by the said Williams, nor what this complainant had reason to believe, or did believe, in respect to the owners of the said township, or what sum was to be paid them therefor, nor at what price the said Williams was to become a purchaser. And this defendant further answering, says,

that he had no previous acquaintance with this complainant, and has no knowledge that this complainant had any previous acquaintance with him, except what might have grown out of a purchase of a carpet for the Unitarian church in Bangor, some years since; whether this complainant supposed and believed that this defendant was well acquainted with the value of timber land in Maine, he cannot say. But this defendant says, that this complainant made no inquiry of him as to the value of this or any other timber land in Maine; and this defendant has no knowledge in respect to the belief of this complainant as to the value of this township. And this defendant further answering, says, that he has no knowledge in respect to what this complainant confided in, or what induced him to make his said purchase, but this defendant absolutely denies that he was instrumental in obtaining any certificate, or that he knew that any certificate had been exhibited to this complainant, or that this defendant had made any representations whatsoever to this complainant in respect to the value of the said township, or that the said Williams had made any representations thereto. And this defendant has no knowledge, or belief, that this defendant's obligations with the said Williams, in any manner deceived this complainant, or operated as an inducement for him to enter into the said contract. And this defendant further answering, admits, as in his former answer he has stated, that the sum of six dollars and fifty cents per acre was not the price for which this defendant agreed to sell three-fourths of the said township to the said Williams, and that the price was the price mentioned in this complainant's supplemental bill. And this defendant further answering, says, that when he signed the said obligation to the said Williams, to convey the said three quarters of the said township at six dollars and fifty cents per acre, he had in his own mind the idea of the deductions made by the state, and had he thought, or supposed that the said Williams would have used the same for any such purposes as in the said complainant's supplemental bill is alleged, he would not have given the same. And this defendant denies, that through the instrumentality of the said Williams he intended to commit, or did commit, any fraud whatsoever upon this complainant. And this defendant, further answering, says, of the said obligation of the said Williams, though not expressing the true intent and meaning of the parties, that it was not fraudulent, or known or intended to be so by this defendant, and that the same was not given with any such purpose or intent, or with the expectation or belief that the same would be thus used; and this defendant did not know, neither did he suspect or believe, that the said Williams, in obtaining the said obligation, intended or

designed to avail himself thereof for any such purpose as is alleged, or might thereby be enabled to dispose of the said land at any price, or thereby to conceal the price which he was to pay therefor. or thereby to induce any person to believe that he was not to pay therefor the price stipulated for in said obli-. gation. And this defendant denies, that he did give to the said Williams the said obli- gation with any knowledge or intention that he was thereby placing it in the power of the said Williams, or that he knew or be- lieved that the said Williams would use the same in any manner to deceive or defraud any person who might be disposed to pur- chase any portion of the said land. And this defendant further answering, says, that the said Williams did not only affect to be- come, but did actually become, a purchaser of one eighth of the said township, and did pay therefor to this defendant, as aforesaid, independently of the money and notes of this complainant and his co-purchasers, the sum of two thousand seven hundred and ninety-two dollars and fifty cents; which sum, and the interest on the price paid for the said three quarters from the day of the date of the said refusal, he paid, at that time, in money and his two promissory notes, for one thousand dollars each; and the said Goss paid four thousand dollars in sixty days' pa- per, and gave his two several promissory notes for four thousand dollars each; which last two notes of the said Goss, and the said Williams's notes were secured by mortgages of their respective interests in the said town- ship. And this defendant further answering, says, that he has no knowledge to whom this complainant gave the said promissory notes for the said purchase, but that he re- ceived this complainant's notes, as stated in his original answer, from the said Wil- liams, in part payment of the said Williams's payment for the said township. And this defendant further answering, says, that he received from the said Williams the sum of ninety thousand dollars for three quarters of the said township; that he had no interest in the said three fourths, and that the amount paid to him by the said Williams was by him accounted for to Amos M. Rob- erts, Isaac Farrar, and Norcross & Mason, who were the owners of the said three fourths, by him sold; and although he did subsequently give his notes to Messrs. Le Bretton & Moody for one sixth of the said ninety thousand dollars, it was in conse- quence of the said Norcross & Mason's hav- ing transferred to them one moiety of their interest. And this defendant further answer- ing, says, that he has no knowledge of any representations having been made by the said Williams to this complainant in rela- tion to any of the matters inquired of in this complainant's supplemental bill of com- plaint."

The answer of the other defendants did not materially vary the case.

The cause was argued again at this term upon the original and supplemental pro- ceedings, by William Pitt Fessenden. for plaintiff, and by Mr. Rowe and J. Rogers for defendants.

STORY, Circuit Justice. This is one of that unfortunate class of cases, which grew out of the marvellous spirit of speculation in tim- ber lands, which a few years ago pervaded the whole state of Maine, and spread such wide ruin and disaster in many directions, and produced a most sad spectacle of de- lusion and moral infirmity. The cause has been argued at great length, and with great ability. I shall not pretend to go over the complicated facts presented in the printed record; but shall principally advert to those questions. which, in my judgment, involve the substantial merits of the case, and to those conclusions of facts, which I have drawn from a full survey of the evidence, in their application to those questions. The material questions appear to me to be these: In the first place. was the plaintiff, Doggett, induced to make the purchase by any gross misrepresentations or mistakes. on the part of Williams, as to the quality of the land in the township, or the amount and quality of the timber thereon? In the next place, was Williams the agent of Emerson, and the other co-defendants. in the negotiation and sale to the plaintiff? In the next place, do the lapse of time and the intervening circumstances interpose any bar to the present bill, suppos- ing the other questions to be decided favora- bly to the plaintiff?

Upon the first question, it does not appear to me that there is any reasonable ground to doubt. that the purchase of the plaintiff was made upon an entire credit given to the representations of Williams of the quantity and quality of the timber on the township. The plaintiff resided in Boston, and. con- fessedly, had no knowledge of timber lands, and had never seen the township. He must, therefore, have placed implicit reliance upon the statements of Williams. Now it is quite immaterial, in a case of this sort. whether Williams was himself at once the deceiver and the deceived. The question is not, wheth- er he acted basely and falsely; but whether the plaintiff purchased upon the faith of the truth of his representations. If the plaintiff did so purchase. then. upon the settled prin- ciples of courts of equity. the bargain ought to be set aside as founded upon gross mis- representation and gross mistake, going to its very essence and objects. The whole doc- trine turns upon this. that he who misleads the confidence of another by false statements in the substance of a purchase shall be the sufferer. and not his victim. I had occasion to consider this subject somewhat at large in the case of Daniel v. Mitchell [Case No. 3,- 562]. It came also under consideration in some of its aspects in the case of Small v. Attwood, 1 Younge. 407, 459, and was elabor-

ately discussed in the house of lords, in the same case, on an appeal from the decree of the court of exchequer. Now it is manifest that the sole object of this purchase, was in the then inflated and exaggerated state of the market respecting timber lands, the timber on the township. The object was, not settlement or agricultural purposes, but speculation on the sale of the timber on the township. The quantity and the quality of the timber, were, if not the sole, the main object of the bargain. It appears to me, that it is high time, that the principles of courts of equity upon the subject of sales and purchases should be better understood, and more rigidly enforced in the community. It is equally promotive of sound morals. fair dealing and public justice and policy, that every vendor should distinctly comprehend, not only that good faith should reign over all his conduct in relation to the sale, but that there should be the most scrupulous good faith, an exalted honesty, or, as it is often felicitously expressed, uberrima fides, in every representation made by him as an inducement to the sale. He should, literally, in his representation, tell the truth, the whole truth, and nothing but the truth. If his representation is false in any one substantial circumstance going to the inducement or essence of the bargain, and the vendee is thereby misled, the sale is voidable; and it is usually immaterial, whether the representation be wilfully and designedly false, or ignorantly or negligently untrue. The vendor acts at his peril, and is bound by every syllable he utters, or proclaims, or knowingly impresses upon the vendee. as a lure or decisive motive for the bargain. And I cannot but believe, if this doctrine of law had been steadfastly kept in view, and fairly upheld by public opinion, the various speculations, which have been so sad a reproach to our country. would have been greatly averted, if not entirely suppressed. by its salutary operation.

In the present case, the representations made by Williams, and confirmed by the certificates, which he produced with such an ambitious display, as the main inducements to the purchase. are, as is now conceded, grossly false. It is impossible, perhaps, at this moment to say exactly the amount of timber, which, at the time of the sale, was standing on the township. In all probability it does not contain more than from four to eight millions of feet of merchantable timber. In 1831, one Kelsey was employed by the land agent of the state of Maine, to survey and examine it, and he represented it to contain eighteen millions of feet; whereas, Emerson himself, in his memorial to the state commissioners in 1841, made to procure a reduction of the bonds given to the state, avers under oath, that "it does not contain three millions, probably not one million of merchantable timber of the first quality;" so that he treats Kelsey's survey as a very gross exaggeration, founded in positive mis-

take. And the commissioners of the state, in their report, after full examination of the evidence, stated, that the township "did not contain pine timber of a sound and valuable quality to the amount of more than one fourth part of what was estimated in the survey and filed notes of the surveyor Kelsey." But what shall we say to the certificates of Towle, and others, shown to the plaintiff by Williams at the time of, and as inducements for, the purchase? It is said that these certificates were not procured by Emerson and the other defendants; but they were procured by other persons contemplating a purchase from the defendants, and were known to, and used by Goss, the brother-in-law of Emerson; and being in the same house with him, and interested in the sale of the township, were put into the hands of Williams, by Goss, for the purpose of being used in procuring purchasers. Again, it is said, that Emerson and the other defendants had no knowledge, that the certificates were used or designed to be used by Williams in accomplishing a sale of the township; and they, therefore, are not partners to, or to be affected by his acts. But if Williams was, and acted as their agent in the sale, then his representations bind them, or the sale must be treated as a mere nullity. If they did not authorize the use of the certificates nor the representations of Williams, and he was their agent, then one of two things must be the result; either, that the sale, having been made by the agent upon false material representations binds them to make those representations good, they having afterwards adopted and confirmed the sale; if so, they must be bound by it cum onere, with all the incidents; or, the sale having been without authority from the defendants, and procured by false material representations of Williams, is not binding, either upon the defendants or upon the plaintiff. In short, the sale is utterly void; the plaintiff, as purchaser, cannot be bound by a sale made by an agent, who falsely represents the quantity and quality of the thing sold. for if he is to be bound by the sale, it is because the agent has authority to make the representations as well as the contract. And the defendants cannot avail themselves of the contract, as a sale by their agent, and repudiate the accompanying representations. The defendants are bound by the contract of sale in its totality, or not at all; so that the actual posture of the case. if it be one of agency by Williams, is either a nullity throughout, or binding throughout. The principals have no right to bind the other party by a ratification of part of his acts and transactions, and by a rejection of the rest. They must take the whole or none. The representations are a part of the res gestae, and not separable from the sale. The question as to the agency of Williams will arise hereafter. Now, the certificates above alluded to. which constituted the basis, as it were, of the purchase,

represent the township to contain from one hundred and fifty to two hundred millions of timber. So gross an exaggeration, so extravagant an estimate, never could have been made in good faith by the certificate makers —notwithstanding their affected sincerity— nor could the certificates have been intended otherwise than to mislead and cheat purchasers, credulous, if you please, but on that very account more easily seduced and deceived. This record, as well as some others of a kindred character, which have already been before this court, exhibit a very low standard of morals and duty—if one might not more strongly characterize it as a most unscrupulous profligacy—much in vogue among this class of certificate makers. Admitting, that Williams himself was a dupe of the deception, (which is not very easily to be admitted), the aggravation of the case is not lessened as to the plaintiff and other purchasers. They believed in him and in the certificates, and the plaintiff made the purchase upon the faith of both. It was, therefore, either a case of mutual mistake or of gross misrepresentation in a matter vital to, and constituting the very basis of the bargain. If the law would tolerate such a bargain, which I am very slow to believe, it would find no countenance in a court of equity. There is not any ground to suppose, that Emerson was not acquainted with the contents of these certificates. On the contrary, if Williams is to be believed, his testimony fully establishes, that Emerson not only knew the contents, but corroborated them; and there is some other independent testimony in the record to the same effect. There is, besides, a not unimportant ingredient in this case, which ought not to be passed over in silence. The paper given by Emerson to Williams, (of which we have several versions in the case not differing substantially from each other in their import on this point,) affirms, that Williams is to have the refusal of three fourths of the township at six dollars and fifty cents per acre:—the terms one third cash, one third in one, and one third in two years, with interest annually. Now from this paper it would seem, that Emerson was to retain one quarter part on his own account; and that the real price was truly stated. In point of fact, the price is untruly stated, and as it would seem purposely. At all events, it could not but mislead, as it was considerably higher than the actual bargain, and would have a tendency to show, that Emerson placed a higher value on the land than was the truth. The other defendants deny, in their answers, that they ever authorized Emerson to sell any portion less than the whole township, or that they ever authorized him to make such a contract of refusal as he gave to Williams. Be it so. They subsequently ratified the sale as made to the plaintiff, and are bound by it, as much as if they had given a precedent authority. There is some attempt made to explain the

ground of this false statement of the price in the paper given by Emerson to Williams; but I must say, that it is wholly unsatisfactory, and looks very much like an afterthought. Besides, the paper would naturally lead every purchaser to suppose that the price was six dollars and fifty cents for every acre in the whole township; and not upon a deduction on account of an excess of land covered with water in the township beyond the usual quantity. Nay, such is the obvious purport of the language used in it. Emerson could not but know, that the paper would be shown to purchasers; nay, that its known object must have been to procure purchasers. Why then should he have suffered them to be misled by a statement now admitted to be untrue on the face of the paper?

Passing from this, let us proceed to the next question, and that is, whether the sale was made by Williams, as the agent of Emerson and the other defendants, or on his own sole account as principal. I am aware of the positive denial of Emerson of any such agency; but, looking at all the facts, is not the agency substantially an inference of law? If Williams is to be believed, he acted as the agent of Emerson and the other defendants, and not upon his own sole account as a purchaser. It is said, that Williams is an interested witness; but it seems to me, that his interest is no more than that of any other person, called as a witness to establish his agency in a particular transaction; and the competency of such a witness is a known exception, in the law of evidence, to what may be deemed the general rule. Then, again, his credibility is assailed, upon the ground of his mistakes and the frail state of his memory. But the ex parte deposition, taken in May, 1842, before his apoplectic attack, if it be not primary evidence, is, at least, corroborative evidence of his deposition in November, 1842, to the general truth of his statements, as to all the material facts on which I rely upon the present occasion; and his testimony derives no small support incidentally from other witnesses. The main fact, whether he was a purchaser or an agent, is scarcely a matter in which he could be under any error or mistake. The paper given to Williams by Emerson is by no means inconsistent with the suggestion, that he was an agent. It is precisely what would take place, if the design was to conceal the agency, and yet at the same time to give the agent an interest and premium upon all he could sell the township for beyond a fixed price. Such a course of proceeding is not unknown in general commercial business; and this court has had occasion to know, that, in the recent timber land speculations, it was not an uncommon expedient. It was not unimportant to give to a real agent, the appearance and character of a purchaser on his own account. His representations would be likely to be listened to with more respect and confidence, as a purchaser, than as an agent,

clothed with the instructions and interests of others. The subsequent facts corroborate this view of the matter. All the defendants, except Emerson, deny, that they ever authorized him to give any such paper of refusal, or to sell sub modo. Emerson was to sell for all of them, and to sell the entirety of the township; and certainly he might consistently employ a sub-agent to effect the sale upon such terms as he, Emerson, might dictate and subsequently sanction. Williams never made any deed; but Emerson acted as the substantial party in interest, and the title from the state to the purchasers was procured by and through Emerson. So that, whatever was the form of the transaction, Emerson acted as principal for the defendants in procuring the deeds from the state, and he received the purchase money and took the notes in his own name. Williams incurred no responsibility either to Emerson or to the purchasers in the final arrangements, whatever he might have done in the antecedent steps of the negotiation. Indeed, it is very difficult to see, how, upon the admitted facts, he can be treated as a purchaser from Emerson—or as principal selling to the plaintiff and the other persons, interested in the sale. He never acquired any title to the property himself. How could he then be treated otherwise than as an agent, not in form, but in substance, negotiating for Emerson and the other defendants? It is true, that he was permitted to appear as a principal; but it is equally true, that he was a mere conductor rei, subject to the control and confirmation of the sale by Emerson as the owner of the property.

In considering the testimony of Williams, I have not adverted to the depositions of Moses Paul and Joseph Hanson, introduced into the supplemental record; not that, if regularly introduced into the case, they would in any manner change my opinion as to the value of his testimony; but simply because, being irregularly and improperly taken, and being irrelevant to the matters of the supplemental bill, they must be suppressed.

In the next place, as to the lapse of time. This in many cases is a most important consideration, and weighs much, and sometimes, "est maximi et momenti ponderis," especially when there has been a great change of circumstances as to the character and value of the property, in the intermediate period; and a fortiori, where the party complaining has been fairly put upon his diligence, and has had ample means of inquiring as to all the material facts, and has chosen to lie by in gross indifference and indolence. This question does not indeed seem fairly open upon the present pleadings.

The bill charges that the plaintiff first discovered the gross fraud and imposition practised upon him in July, 1841, and, as it should seem, by means of the memorial of Emerson to the commissioners, in March, 1841, and their report thereon made in July, 1841. The answer sets up no denial to this statement of the bill; and does by implication admit its correctness. But whether this be a just inference or not, it seems to me, that the lapse of time cannot interpose any bar to the relief asked by the bill, if otherwise well founded; for the memorial of Emerson is of itself clear proof, that he was before that time fully aware of all the material facts; and there is no pretence to say, that he communicated them to the plaintiff. Neither is it shown, that the plaintiff had, by any other means, obtained suitable information to put him upon inquiry. In short, for aught that appears in the case, the plaintiff never discovered the gross falsity of the representations made to him until the memorial and report brought it home to his knowledge. Besides, as was remarked by the lord chancellor in Partridge v. Usborne, 5 Russ. 195, 232, when one party to a contract makes a positive representation, it is not laches in the other not to proceed immediately to verify that representation. At all events, the defence is not put upon any such ground as the lapse of time, and knowledge by the plaintiff of the material facts, so as to have called upon him for precise proofs of his real situation and of the time when he first discovered the full nature and extent of the deception practised upon him. So that it seems to me, that the court is not called upon in this case, by the state of the pleadings and evidence, to act upon any such defence as the lapse of time, whatever, under other circumstances, might have been the just value of any such defence. Upon the whole, without going more at large into the merits of the case. my opinion is, that the contract of sale with the plaintiff ought to be set aside. as founded in gross mistake and gross misrepresentation, and that the plaintiff ought to be restored to his original rights, and receive back the purchase money, upon executing a due re-conveyance to the defendants, and making such other allowances as upon a hearing before a master shall, under all circumstances, be equitable and just.

[NOTE. This cause was heard in vacation, by agreement of the parties, but Judge Story died before the decree sketched out by him was entered. A motion to enter the decree at the next term was granted by Judge Woodbury over respondents' objections. See Case No. 3,961. Afterwards the cause was heard on exceptions to the master's report, and also upon an application of respondent Norcross to put in evidence. under a cross bill, a discharge obtained by him in bankruptcy. See Case No. 3,962.]